**UNITED STATES of America,**
**Appellant,**

v.

**Leo LUTZ, Appellee.**

**No. 18495.**

United States Court of Appeals
Fifth Circuit.

Nov. 3, 1961.

---

1. Indiana Guest Statute, Burns' Indiana Statutes Annotated, 1952 Replacement, § 47–1021.

Earle B. May, Jr., Asst. U. S. Atty., Macon, Ga., Ronald A. Jacks, Morton Hollander, Attys., Dept. of Justice, Washington, D. C., George Cochran Doub, Asst. Atty. Gen., Frank O. Evans, U. S. Atty., Macon, Ga., William H. Orrick, Jr., Asst. Atty. Gen., for appellant.

Frank S. Twitty, Frank S. Twitty, Jr., Camilla, Ga., for appellee.

Before TUTTLE, Chief Judge, JONES, and WISDOM, Circuit Judges.

WISDOM, Circuit Judge.

The United States, plaintiff-appellant, seeks recovery from Leo Lutz, defendant, for debts owed by two corporations the defendant owned and managed. Lutz was the president, a director and, except for qualifying shares held by other directors, the sole shareholder of both corporations.

In October 1952 the Army contracted to purchase $35,897 worth of canned tomatoes from two Indiana food processing corporations, Lutz Canning Co. ($27,168) and Delphi Canning Co. ($8,729). Although the Army made immediate payment, the tomatoes were not to be de-

livered until March 1953. The contract required the sellers to indemnify the Government for the loss of or damage to any supplies remaining in the sellers' possession after title had vested in the Government. Misfortune struck November 28, 1952, when a fire totally destroyed a Delphi warehouse and about $100,000 worth of tomatoes. The Government asserts that by the terms of the purchase contract $35,000 worth of those tomatoes belonged to it. Under an insurance policy covering the contents of its warehouse Delphi collected $100,000 for the loss of the tomatoes. Lutz turned over $65,000 of these proceeds to an Indianapolis bank that held warehouse receipts on the inventory and used the remaining funds to pay debts to general creditors of the corporations. He testified that the Lutz Canning Co. had 80,000 to 90,000 cases of tomatoes at its warehouse in Defiance, Ohio and that he had anticipated paying the debt to the Government with the proceeds from the sale of those assets. Then the market for tomatoes collapsed. Tomatoes fell from $1.60 a dozen to $1.20 a dozen. Lutz was forced to sell the tomatoes at a loss, leaving the corporations without sufficient funds to pay all creditors. Although they have not filed a petition in bankruptcy, the corporations did cease their business operations and have been unable to pay the Government debt.

The United States contends that the corporations were obligated to hold the insurance proceeds in trust for it; by participating in the distribution of the assets to other creditors Lutz became personally liable under the common law doctrine imposing personal liability on a corporate officer who misappropriates funds belonging to another, even though he receives no benefit himself.[1] We reject this contention: the Government has failed to show that the corporations were required to turn over the insurance proceeds to it. The Government argues, alternatively, that the defendant became liable under 31 U.S.C.A. § 192 by paying corporate debts to other persons before satisfying the debts to the United States. On this point, we hold that the Government may recover if, and only if, it can show that the corporation was insolvent when the defendant paid the other debts. We remand the case for a finding of fact on this question.

### I.

Under its common law theory of liability, in order to recover the Government must cross three hurdles. It must show (A) that it had acquired ownership of the tomatoes destroyed by fire, (B) that its ownership of the tomatoes gave it a right to the insurance proceeds collected for their loss, and (C) that the defendant became personally liable when as officer for the corporations he distributed the proceeds in payment of other corporate debts. Failure of the Government to cross the second hurdle makes it unnecessary to discuss the third.

A. The Government walks across the low first hurdle on steps built by the defendant in his answer, his stipulations, and his testimony. The complaint alleged that "property of the plaintiff was destroyed by fire in the warehouse of Delphi Canning Company" and specified the property; in his answer the defendant admitted those allegations. The pre-trial stipulation between the parties stated their agreement that "the plaintiff owned the tomatoes". The defendant's testimony is to the same effect.[2] The trial

---

1. See Lobato v. Pay Less Drug Store, 10 Cir., 1958, 261 F.2d 406; American Agricultural Chemical Co., Inc. v. Barnes, D.C.E.D.La., 1939, 28 F.Supp. 73; Hirsch v. Phily, 4 N.J. 408, 77 A.2d 173.

2. When asked, "And is it true that you had certain tomatoes which had been sold to the United States stored in your warehouses there in Delphi, Indiana?" the defendant's answer was, "Yes, sir." The

defendant's brief takes the contrary position that the Government did not own any of the tomatoes stored in the Delphi warehouse. It asserts that the sellers were not obliged to deliver the tomatoes until nearly six months after the fire, that there was no way to identify the tomatoes which the sellers would deliver, and that therefore title did not vest in the Government.

judge properly found that the Government did own the destroyed tomatoes.

B. The Government attempts to cross the second hurdle from two approaches. Neither succeeds.

█ (1) First, it asserts that the indemnification agreement in the contract gave the Government a right to the insurance proceeds collected by the corporations, an argument based on our decision in United States v. Seaboard Machinery Corp., 5 Cir., 1959, 270 F.2d 817, certiorari denied, 362 U.S. 941, [80 S.Ct. 806, 4 L.Ed.2d 770]. That decision is inapplicable. There we were concerned with whether the corporation became liable when a fire destroyed shipyard equipment leased from the government. The lease agreement required the lessee to keep the machinery in good condition and "replace and/or repair any and all damage thereto to the extent that upon the termination of this lease all of the said machines shall be returned to the Owner in as good condition as when the Hirer received the same." We held that this clause placed the risk of loss without fault on the lessee and granted recovery to the Government. Not at issue was the question whether the Government became a general creditor of the corporation or acquired a priority over its other creditors. The defendant had agreed that if found liable he would turn over the insurance proceeds to the Government in satisfaction of the debt. Since no claims by other creditors were presented, the only question involved was whether the contract rendered the corporation liable to the Government. But here the Government must prove more than general contract liability (indeed, Lutz admits that the corporations became indebted for the lost tomatoes). The United States must show that it acquired a protected interest in the insurance proceeds obligating the corporations to hold those funds to pay their debt to the Government. Seaboard does not bear on this issue.

(2) The Government's alternative approach is that it was entitled to the insurance payments on its destroyed property under accepted principles of bailment and insurance. The argument is that after title vested in the Government the sellers were bailees. As such, they would be obligated to hold for the owner of the destroyed goods the insurance money collected on the loss; to hold otherwise, the argument runs, would defeat the Government's rights of ownership and would do violence to the policy against allowing a bailee to collect insurance when he had no insurable interest in the goods. These principles would be controlling if, after transfer of title, the seller had retained possession without assuming liability for the risk of loss. They are not controlling, because the contract provision making the defendant liable in the event of loss does not simply add more weight to his obligation as a bailee to protect the buyer's rights of ownership: it produces a new pattern of obligations that must be examined in the light of the legal relationship between the parties.

█ The appellant relies on a line of cases holding that where a bailee has recovered insurance for the loss of goods in his possession he must hold the proceeds for the owner.[3] The result in those cases, however, was dictated by the fact that in each instance *the owner* carried the risk of loss. Under the settled rules of common law the duty of the bailee was limited to the exercise of due care, and if goods were destroyed without fault the owner had no right to hold the bailee liable.[4] If the bailee were allowed to recover insurance in his own right, the owner would be unreimbursed for his loss while the bailee would gain a windfall.

---

3. E. g., Home Insurance Co. v. Baltimore Warehouse Co., 1876, 93 U.S. 527, 23 L. Ed. 868; California Ins. Co. v. Union Compress Co., 1890, 133 U.S. 387, 10 S. Ct. 365, 33 L.Ed. 730.

4. Indamer Corp. v. Crandon, 5 Cir., 1952, 196 F.2d 5; Fairmont Coal Co. v. Jones & Adams Co., 7 Cir., 1905, 134 F. 711; Balogh v. Jewelers Mut. Ins. Co., D.C. S.D.Fla., 1958, 167 F.Supp. 763. See 6 Am.Jur., Bailments § 242 (1950).

The bailee's realization of an insurance benefit for the destruction of goods in his possession would be in direct conflict with the policy against allowing a person having no insurable interest in goods to collect insurance on the goods.[5] To avoid violation of this policy, the courts either declared the insurance contract ineffective or required the bailee to recover the insurance on behalf of the owner as a third party beneficiary.[6] On the other hand, when the contract between the bailee and bailor has shifted the risk of loss to the bailee, as in this case, the tables are reversed. Since the owner has a remedy against the bailee for the loss of the goods, the objection to allowing the bailee to recover the insurance proceeds in his own behalf is removed; there will be no unreimbursed loss to the owner and no windfall to the bailee.

■ There is no merit therefore in the Government's contention that denial of recovery will controvert the insurable interest doctrine. The contract provision making the bailee absolutely liable for the goods shifted the insurable interest to him. The owner acquired a right to recover from the bailee for the loss of the goods; the bailee was the one who had to obtain insurance to avoid bearing loss.[7] Since the same event that would give the bailee a right to recover insurance proceeds would also render him liable to the bailor, there was no opportunity to benefit from the destruction of the goods, and the reason for application of the insurable interest doctrine disappears.[8]

■ Ownership of property comprises numerous different attributes. The owner has the right to use and control the property, to exclude others from the use of it, and to sue to regain possession from one who has taken it without permission or to obtain damages from one who has injured it. Included within the bundle of rights and responsibilities is the liability that when the property

---

5. It has long been settled that a person having no interest in the property destroyed cannot recover on a policy of insurance. Howard Fire Ins. Co. v. Chase, 1867, 5 Wall. 509, 72 U.S. 509, 512–513, 18 L.Ed. 524, 526. "A contract of insurance is intended to indemnify one who is insured against an uncertain event, which, if it occurs, will cause him loss or damage. The assured must therefore have an interest in the property insured; otherwise, there is a temptation to destroy it, which sound policy condemns." See Peoples Life Ins. Co. v. Whiteside, 5 Cir., 1938, 94 F.2d 409, certiorari denied, 304 U.S. 567, 58 S.Ct. 949, 82 L. Ed. 1533; Chase v. Hammond Lumber Co., 9 Cir., 1935, 79 F.2d 716; Lowery v. Connecticut Fire Ins. Co., 2 Cir., 1934, 70 F.2d 324, certiorari denied, 293 U.S. 576, 55 S.Ct. 88, 79 L.Ed. 674.

6. In American Surety Co. of New York v. Normandy State Bank, 8 Cir., 1940, 108 F.2d 819, 822, the court observed, "It has been held that one having the care, custody or possession of property for another, though without liability and without any pecuniary interest, may nevertheless obtain insurance upon such property for the benefit of the owner." See also California Insurance Co. v. Union Compress Co., 1890, 133 U.S. 387, 410, 10 S. Ct. 365, 370, 33 L.Ed. 730, 736, where the

Supreme Court stated, "such bailor can, to the extent of his insurable interest, claim the benefit of insurance effected in his favor by his bailee."

7. The owner could insure the property himself, but this would not absolve the bailee of his primary responsibility for the loss, since the owner's insurance company would be subrogated to the owner's rights to hold the bailee liable under the contract. Chicago, St. L. & N. O. R. Co. v. Pullman Southern Car Co., 1891, 139 U.S. 79, 11 S.Ct. 490, 35 L.Ed. 97.

8. Germania Fire Ins. Co. v. Thompson, 1877, 95 U.S. 547, 24 L.Ed. 487. In Connecticut Fire Ins. Co. v. Evans, 5 Cir., 1931, 53 F.2d 839, 840 this Court held that potential liability does constitute an insurable interest. We stated:
"Evans had an insurable interest in the abstracts, as he was under obligation to the Sugg estate to replace at his own expense such of them as he might lose or fail to return. He therefore had the right as bailee to insure his interest in his own name and to recover from the insurer the full amount payable under the policy. * * * By reason of his contract with the Sugg estate, Evans had the same interest in the abstracts while they were in his possession as he would have had if he had been the owner * * *."

is destroyed without fault the loss falls on the owner. When property is sold the question occurs as to when these attributes of ownership pass to the purchaser. Under common law and statutes such as the Uniform Sales Act the entire bundle passes when "title" vests in the new owner. But the fact that the bundle passes as a bundle does not obscure the individuality of the various attributes of ownership, and the contracting parties may provide that certain attributes pass separately and at a different time from the others. Under the Uniform Commercial Code the attributes pass to the new owner at different times even without express provision in the contract. See Braucher and Sutherland, Commercial Transactions 23–27 (1958).

The effect of a contract provision placing absolute liability on the seller for goods remaining in his possession after title has passed is to postpone passage of the risk-of-loss attribute until possession of the property is transferred. When the goods are destroyed the responsibility falls on the seller, who must meet his obligations under the contract for failure to deliver the goods. Alternatively, the seller corporations may be viewed as insurers of the goods. After title to the tomatoes passed to the Government, the sellers performed a dual function. By retention of possession they became bailees obligated to exercise reasonable care in their custody of the purchaser's property. By special contract provision they assumed liability for the risk of loss of the property without fault. The sellers agreed, in the same manner that any other insurer does, to stand responsible for the property and to reimburse the owner for its value in the event of loss.

Whether the sellers be viewed as owners for purposes of the risk of loss who must make good on their failure to deliver the property or as bailees who have assumed an insurer's liability, the Government's rights arise under the contract provision imposing liability on the seller for the loss of the goods. The contract provision does not purport to give the Government anything more than a general right to a money judgment against the sellers. This would perhaps be more immediately apparent if the sellers had not taken out insurance covering the risk that they would become liable to the plaintiff. Then there would be no funds or assets that the plaintiff could point to with an allegation of ownership rights, and its only claim would be as a general creditor. That the sellers did have insurance does not alter the picture, since the *sole purpose of that insurance was to cover risks imposed on the sellers* and since the sellers possessed an insurable interest in the full amount of the proceeds collected. The Government did not require the sellers to put up collateral to cover the risk that the purchased property might be destroyed and it did not require the sellers to obtain insurance with an independent company to cover that risk. It contracted only for an agreement that liability for the loss would fall on the seller, and that liability, like the liability to any other general creditor, was subject to the risk of the sellers' insolvency. Having taken out the insurance without obligation to the plaintiff, the corporations were entitled to receive the insurance proceeds free of any obligation to the plaintiff. The Government cannot claim to have been injured by the defendant's distribution of the insurance proceeds, since it had no right to expect that there would be any proceeds.

We conclude that the United States has not crossed the hurdle of showing that the canning companies were obligated to hold the insurance proceeds for it, and cannot recover on its common law theory of liability. It is therefore not necessary to discuss whether Lutz is personally liable.

### II.

The Government's alternative theory of recovery is that under 31 U.S.C.A. § 192 the defendant became personally liable for payment of other corporate debts while the corporations had outstanding liabilities to the Government. Section 192 provides:

"Every executor, administrator, or assignee, or other person, who pays, in whole or in part, any debt due by the person or estate for whom or for which he acts before he satisfies and pays the debts due to the United States from such person or estate, shall become answerable in his own person and estate to the extent of such payments for the debts so due to the United States, or for so much thereof as may remain due and unpaid."

The parties dispute two points with regard to this theory: (A) the legal question whether § 192 must be read in pari materia with § 191,[9] so as to preclude personal liability unless the corporation was insolvent when the payments to the other creditors were made; (B) the factual question whether the corporations managed by the defendant were insolvent when the defendant distributed the insurance proceeds to the other creditors.

A. The statutes have an historical relation to early efforts of the founding fathers to make this country a union and not a confederation of states. The precursor of Section 191 was enacted in 1797 to give the government a priority in the recovery of its debts from insolvent persons. When that section was reenacted in 1799 the forerunner of Section 192 was passed as a companion measure. This coincidence of enactment raises an inference that the two provisions should be read together as parts of a single legislative plan. The inference is confirmed by consideration of the operation and effect of Section 192. Construed in conjunction with Section 191, as applicable only to distributions from insolvent corporations, the section promotes obedience to the requirement of Section 191 that

government debts be given priority when a corportion is insolvent, and it protects the government's interest when that requirement is violated. It accomplishes this without overshooting the coverage of Section 191 and without burdening business operations except in cases of insolvency, when the government is in danger of being unable to collect its debts. It imposes the danger of personal liability on the corporate officers only at times when because of the shortage in funds they should be alert to the necessity for paying debts according to their priorities.

By contrast, the Government's construction of the statute would produce a far-reaching effect that we cannot believe was intended by Congress. It would subject corporate officers to the harsh rule that whenever they paid any debt at a time when the corporation owed money to the government, no matter how solvent the corporation, they would be personally liable should the corporation eventually be unable to repay the government debt. Active corporations have a rapid cash turnover; officers of such corporations would be guarantors of almost any corporate indebtedness to the government. Personal risk would force the officers to pay the government debt first, irrespective of whether a different arrangement would better advance the interests of the contracting parties, the corporation and the government. This could, as a practical matter, nullify the restriction in Section 191 that the government priority should arise only where the corporation is insolvent.

■■ The scant authority bearing on this question is unanimous in holding that the two sections must be construed together. United States v. Giger, D.C. Ark.1939, 26 F.Supp. 624. See Bram-

9. 31 U.S.C.A. § 191 reads as follows:
"Whenever any person indebted to the United States is insolvent or whenever the estate of any deceased debtor, in the hands of the executors or administrators, is insufficient to pay all the debts due from the deceased, the debts due to the United States shall be first satisfied; and the priority established shall extend as

well to cases in which a debtor, not having sufficient property to pay all his debts, makes a voluntary assignment thereof, or in which the estate and effects of an absconding, concealed or absent debtor are attached by process of law, as to cases in which an act of bankruptcy is committed."

well v. U. S. Fidelity & Guaranty Co., 1926, 269 U.S. 483, 46 S.Ct. 176, 70 L.Ed. 368; United States v. Butterworth-Judson Corp., 1926, 269 U.S. 504, 46 S.Ct. 179, 70 L.Ed. 380; Hatch v. Morosco Holding Co., Inc., D.C.N.Y.1932, 56 F.2d 640, affirmed 2 Cir., 61 F.2d 944, certiorari denied, 288 U.S. 613; [53 S.Ct. 404, 77 L.Ed. 986]; United States v. Western Union Telegraph Co., 2 Cir., 1931, 50 F.2d 102. We believe this to be the correct interpretation of Section 192. We hold that this section applies only when the individual has acted in disregard of a government priority established by Section 191, jeopardizing the collection of a government debt by the distribution of assets of an insolvent corporation.

■ The Government declares that even if it is appropriate to take Section 191 into consideration the critical question is whether the debtor actually became insolvent and whether the Government was eventually unable to collect its claim. This contention ignores the fact that under Section 191 the government priority does not arise until the corporation becomes insolvent. The Government, in effect, is arguing for a retroactive priority, one that would render a corporate officer liable for payments in disregard of a government priority which itself did not arise until after the payments were made. Such an approach would directly defeat the purpose of reading Section 192 in conjunction with Section 191, that is, to protect the officer who makes a distribution of corporate assets when a government priority does not exist.

B. The record is not sufficient for us to determine whether the corporations were solvent when the distributions were made.[10] It does not appear whether the drop in the price of tomatoes, causing the corporation to become insolvent, occurred before or after the distribution of the insurance proceeds to the corporations' creditors.

Accordingly we remand the case for the trial judge to make the appropriate finding of fact, and to dispose of the case in a manner not inconsistent with this opinion.

10. The trial judge did not make any findings of fact on this question. In Finding Number Five he stated, "That at the time of the fire, both corporations were solvent but on account of drop in price of tomatoes, they were unable to meet all of their obligations including the sum due to the United States. Both corporations are still in existence and have never been dissolved." This finding does not decide the question because the insurance proceeds were of course received and distributed some time after the fire.