# IN THE UNITED STATES COURT OF APPEALS
## FOR THE FIFTH CIRCUIT

United States Court of Appeals
Fifth Circuit

**F I L E D**

February 20, 2013

Lyle W. Cayce
Clerk

No. 11-41203

UNITED STATES OF AMERICA,

Plaintiff – Appellee

v.

OSCAR RENDA,

Defendant – Appellant

Appeal from the United States District Court
for the Eastern District of Texas

Before DEMOSS, SOUTHWICK, and HIGGINSON, Circuit Judges.

HIGGINSON, Circuit Judge.

This case, which arose out of a government dredging contract, requires us to delimit the scope of a corporate officer's personal liability under 31 U.S.C. § 3713 (the "Priority Statute"). Specifically, we are called upon to decide (1) whether the decision of a contracting officer rendered pursuant to the Contract Disputes Act of 1978, as amended, 41 U.S.C. § 7101 et seq. (the "CDA"), constitutes a "claim" within the meaning of the Priority Statute, and, if so, (2) whether a debtor's representative has "notice" of that claim, necessary to trigger personal liability under the Priority Statute, if he has actual knowledge of its existence but relies on the erroneous advice of counsel as to its validity. Answering both questions affirmatively, we AFFIRM.

No. 11-41203

## FACTS AND PROCEEDINGS

In 1998, the United States Army Corps of Engineers (the "Corps") awarded Contract No. DACW-99-C-0001 (the "Dredging Contract") to Renda Marine, Inc. ("Renda Marine"), in the estimated amount of $12,526,100, to dredge a portion of the Houston-Galveston navigation channel. As a contract made by an executive agency for the procurement of services, the Dredging Contract was governed by the CDA, which requires, *inter alia*, that claims by either party "relating to" a government contract be submitted to the contracting officer ("CO") for a written decision. 41 U.S.C. § 7103(a)(1), (d).

Between January and October 2001, Renda Marine submitted eight claims, including seven "differing site condition" claims and one "constructive contract modification" claim, to Contracting Officer Thomas Benero ("CO Benero"), Chief of the Contracting Division for the Corps in Galveston, Texas. In response, the Corps issued Modification No. P00023, which provided for a $3,083,833 equitable adjustment in contract price for additional dredge work completed by Renda Marine in the "flare" area of the channel. CO Benero did not timely issue a final decision on Renda Marine's remaining claims and, as a result, they were considered denied. *See Renda Marine, Inc. v. United States*, 71 Fed. Cl. 782, 784 & n.2 (2006) (referencing a previous version of 41 U.S.C. § 7103(f)(5), which read: "Any failure by the contracting officer to issue a decision on a contract claim within the period required will be deemed to be a decision by the contracting officer denying the claim and will authorize the commencement of the appeal."). On April 11, 2002, Renda Marine timely appealed the denial of its claims to the Court of Federal Claims.[1] *Id*.

---

[1] To timely appeal a CO's decision, a contractor has the option of (1) filing an appeal with the Armed Services Board of Contract Appeals ("ASBCA") within ninety days from receipt of the decision, 41 U.S.C. § 7104(a), or (2) bringing an action in the Court of Federal Claims within one year from receipt of the decision, § 7104(b).

2

No. 11-41203

On November 26, 2002, while Renda Marine's case was pending before the Court of Federal Claims, CO Benero issued a final decision (the "Final Decision") on six counterclaims submitted by the government against Renda Marine for incomplete and deficient work. After setting forth the "items determined to be deficient or incomplete or not in accordance with the contract specifications," the Final Decision "determine[d] that Renda Marine is indebted to the Government in the amount of $11,860,000," plus interest, for the estimated completion costs, directed the company to submit payment by certified check, and notified the company of the statutory avenues of appeal. The Final Decision was addressed to Oscar Renda ("Renda"), the president and majority shareholder of Renda Marine at the time, who later acknowledged receiving and reading it.

After reviewing the Final Decision, Renda called Brian Erikson, an attorney with Quilling, Selander, Lownds, Winslett & Moser, P.C. ("Quilling Selander"), the firm that was representing Renda Marine in the matter pending before the Court of Federal Claims, to seek legal advice on how Renda Marine should proceed. According to Renda, Erikson advised him that the Final Decision "did not require action by Renda Marine" because "any claim the Government made should be addressed in the pending [litigation] before the Court of Federal Claims, so that Benero's findings and decision were void." Consistent with Erikson's advice, Renda Marine did not timely appeal the Final Decision to the ASBCA or Court of Federal Claims.

On July 31, 2003, Renda caused Renda Marine to transfer all of its assets, totaling $8,563,066, to its unsecured creditors in the following amounts: $5,932,900 to Oscar Renda Contracting, Inc.; $484,500 to Renda Environmental, Inc.; $325,000 to Oscar Renda; and $325,000 to Rudolph Renda (the "July 2003 transfer"). On the date of the transfer, Renda Marine's debts, not including the $11.86 million debt asserted in the Final Decision, exceeded the value of its assets by $7,988,798.

3

No. 11-41203

In July 2004, Renda Marine moved for leave to amend its complaint in the Court of Federal Claims to challenge the Final Decision. *Renda Marine, Inc. v. United States*, 65 Fed. Cl. 152, 156 (2005). After hearing oral argument, the Court of Federal Claims denied the motion on the ground that the period for timely appeal of the Final Decision had expired seven months earlier and, accordingly, the court lacked jurisdiction under the CDA to consider it. *Id.* at 156–63. Renda Marine attempted, without success, to relitigate the issue twice during pretrial proceedings, twice during trial, and twice after trial. *Id.* at 153–57; *Renda Marine, Inc. v. United States*, 71 Fed. Cl. 782 (2006). After a nineteen-day trial, the Court of Federal Claims ruled on the merits of Renda Marine's claims against the government, concluding that Renda Marine "failed to prove by a preponderance of the credible evidence that it is entitled to recover on its claims." *Renda Marine, Inc. v. United States*, 66 Fed. Cl. 639, 721 (2005). The court denied Renda Marine's motion for reconsideration and entered final judgment in favor of the government. *Renda Marine, Inc. v. United States*, 71 Fed. Cl. 782 (2006). The judgment was affirmed on appeal to the Federal Circuit. *Renda Marine, Inc. v. United States*, 509 F.3d 1372 (Fed. Cir. 2007).

In 2005, Renda Marine asserted a malpractice claim against Quilling Selander for failing to timely challenge the Final Decision, and ultimately settled the claim for $2 million. Several days after receiving the $2 million settlement, Renda caused Renda Marine to transfer the settlement money to Oscar Renda Contracting, Inc. to repay advances it allegedly had made for Renda Marine's legal expenses (the "December 2005 transfer"). On the date of the transfer, Renda Marine's debts exceeded the value of its assets.

In 2008, the government sued Renda Marine in the United States District Court for the Eastern District of Texas to recoup the $3,083,833 equitable adjustment and to enforce the $11,860,016 claim asserted in the Final Decision. *United States v. Renda Marine, Inc.*, 750 F. Supp. 2d 755, 758–59 (E.D. Tex.

2010).  The district court granted the government's motion for judgment on the pleadings, *id.* at 760–67, and entered judgment for the government in the amount of $22,060,392.78, including interest and penalties.  On appeal, we affirmed the judgment. *United States v. Renda Marine, Inc.*, 667 F.3d 651 (5th Cir. 2012).

In 2009, the government commenced this action, seeking to hold Renda personally liable under the Priority Statute for the amount of the July 2003 and December 2005 transfers he made on behalf of Renda Marine.  Renda raised a number of affirmative defenses attacking the merits of the Final Decision, and, through a counterclaim, sought review of the Final Decision under the Administrative Procedure Act ("APA").  The government moved to dismiss Renda's counterclaim and to strike his affirmative defenses for lack of subject-matter jurisdiction.  Adopting the report and recommendation of Magistrate Judge Bush, the district court granted the motion.  The parties later filed cross-motions for summary judgment, and Renda moved for reconsideration of the district court's dismissal of his counterclaim and affirmative defenses.  Again adopting the report and recommendation of Magistrate Judge Bush, the district court granted the government's motion for summary judgment and denied Renda's motions for summary judgment and reconsideration.  On September 30, 2011, the district court entered final judgment in favor of the government in the amount of $12,468,588.94, the combined value of the two transfers, plus interest.  Renda timely appealed.

## STANDARDS OF REVIEW

We review a district court's summary judgment *de novo,* applying the same standard as the district court. *Moss v. BMC Software, Inc.*, 610 F.3d 917, 922 (5th Cir. 2010).  Summary judgment is warranted if, viewing all evidence in the light most favorable to the non-moving party, the record demonstrates that there is no genuine issue of material fact and that the moving party is entitled to

No. 11-41203

judgment as a matter of law. *Id.* (citing Fed. R. Civ. P. 56(a)). A fact is material if it "might affect the outcome of the suit under the governing law," and a dispute is genuine if "the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986).

We review a district court's order denying a party's motion for reconsideration, made pursuant to Federal Rule of Civil Procedure 54(b), for abuse of discretion. *See Swope v. Columbian Chem. Co.*, 281 F.3d 185, 193 (5th Cir. 2002). Rule 54(b) authorizes a district court to reconsider and reverse its prior rulings on any interlocutory order "for any reason it deems sufficient." *Saqui v. Pride Cent. Am., LLC*, 595 F.3d 206, 210–11 (5th Cir. 2010).

We review a district court's order striking affirmative defenses for abuse of discretion. *Cambridge Toxicology Grp., Inc. v. Exnicios*, 495 F.3d 169, 178 (5th Cir. 2007). Striking an affirmative defense is warranted if it cannot, as a matter of law, succeed under any circumstance. *See id.* (citing Fed. R. Civ. P. 12(f)).

## DISCUSSION

The Priority Statute "is almost as old as the Constitution, and its roots reach back even further into the English common law."[2] *United States v. Moore*, 423 U.S. 77, 80 (1975). Enacted in the shadow of the Revolutionary War, at a time when "many persons had necessarily become indebted to the United States," *United States v. Fisher*, 6 U.S. (2 Cranch) 358, 392 (1805), the Priority Statute was part of the "early efforts of the founding fathers to make this country a union and not a confederation of states." *United States v. Lutz*, 295 F.2d 736, 742 (5th Cir. 1961). In its current iteration, the Priority Statute reads, in pertinent part:

---

[2] For a history of the Priority Statute, including a summary of every Supreme Court case in which it has been interpreted, see Richard H.W. Maloy, *The "Priority Statute" – The United States' "Ace in the Hole"*, 39 J. MARSHALL L. REV. 1205 (2006).

No. 11-41203

(a)(1) A claim[3] of the United States Government[4] shall be paid first when--

    (A) a person[5] indebted to the Government is insolvent[6] and--

        (I) the debtor without enough property to pay all debts makes a voluntary assignment of property; . . . .

(b) A representative[7] of a person or an estate (except a trustee acting under title 11) paying any part of a debt of the person or estate before paying a claim of the Government is liable to the extent of the payment for unpaid claims of the Government.

31 U.S.C. § 3713.

---

[3] "Claim" is defined by statute as "any amount of funds or property that has been determined by an appropriate official of the Federal Government to be owed to the United States by a person, organization, or entity other than another Federal agency." 31 U.S.C. § 3701(b)(1). The term includes, without limitation, "any fines or penalties assessed by an agency" and "other amounts of money or property owed to the Government." § 3701(b)(1)(F)–(G). The terms "claim" and "debt" are used interchangeably in subchapter II. *See* § 3701(b)(1).

[4] A "claim of the United States Government" includes claims made by executive agencies, such as the Army Corps of Engineers, *see Moore*, 423 U.S. at 78, as well as claims made by authorized officers of executive agencies, *U.S. Dep't of Agric., Emerg. Crop & Feed Loans v. Remund*, 330 U.S. 537, 541–43 (1947) ("Whether the claim is filed in the name of the United States or in the name of an officer or agency is immaterial; in the latter instance, the claim is necessarily filed on behalf of the United States and the legal effect is the same as if it had been filed in that name.").

[5] The term "person," as used in the Priority Statute, encompasses corporations. *Beaston v. Farmers' Bank of Del.*, 37 U.S. 102, 134 (1838); *see also Moore*, 423 U.S. at 78–86 (applying the Priority Statute to debt owed by corporation).

[6] An entity is "insolvent," within the meaning of the Priority Statute, if its liabilities exceed its assets. *See Bramwell v. United States*, 269 U.S. 483, 487 (1926); *see also Lakeshore Apts., Inc. v. United States*, 351 F.2d 349, 353 (9th Cir. 1965) (finding corporation insolvent, within the meaning of the Priority Statute, because "its liabilities exceeded its assets"); *United States v. Golden Acres, Inc.*, 684 F. Supp. 96, 101 (D. Del. 1988), *aff'd* 879 F.2d 857 (3d Cir. 1989) ("Under the Federal Priority Statute, a debtor is insolvent when its liabilities exceed its assets.").

[7] The term "representative" has been construed to encompass corporate officers. *See Lutz*, 295 F.2d at 742 (explaining that the representative liability provision "imposes the danger of personal liability on [] corporate officers"); *see also Golden Acres*, 684 F. Supp. at 102–03 (finding corporate officers personally liable under § 3713(b)).

No. 11-41203

The representative liability provision, the provision at issue in this case, gives the Priority Statute "teeth" by making a representative who pays a non-federal debt on behalf of a corporation before paying a federal claim personally liable for the amount paid. *Moore*, 423 U.S. at 80; *see also* William T. Plumb, Jr., *Federal Liens and Priorities—Agenda for the Next Decade*, 77 YALE L.J. 228, 255 (1968) ("[T]he proper intended function of the [representative liability provision] is to serve as 'policeman' for [the priority provision], by permitting the Government to recoup from the fiduciaries administering insolvent estates when they injure the Government by disregarding its priority.").

> Read literally, . . . [subsection (b)] would . . . require the management of a solvent business . . . to act at its peril in paying other debts while federal claims are owing, for if the business should later become unable to pay the federal claims the management could be liable; further, the provision would impose personal liability even on one who pays other debts innocently and with no reason to support that there may be obligations owing to the United States.

*See* William T. Plumb, Jr., *The Federal Priority in Insolvency: Proposals for Reform*, 70 MICH. L. REV. 1, 87 (1971). To avoid such a result, the few courts to have interpreted § 3713(b)[8] have read into the provision the additional requirements that the representative have "knowledge of the debt owed by the estate to the United States or notice of facts that would lead a reasonably prudent person to inquire as to [its] existence,"[9] and "the corporation [be] insolvent when

---

[8] Maloy, *supra* note 3, at 1280 (noting the "scarcity of law pertaining to 31 U.S.C. § 3713(b)").

[9] *United States v. Coppola*, 85 F.3d 1015, 1020 (2d Cir. 1996); *see also Little v. C.I.R.*, 113 T.C. 474, 480 (1999) ("This section appears to impose strict liability on a fiduciary who makes a disbursement which leaves the estate with insufficient funds with which to pay a debt owed to the United States. However, courts have long departed from such a rigid interpretation. It has long been held that a fiduciary is liable only if it had notice of the claim of the United States before making the distribution. Whether the fiduciary had notice is determined by whether the executor knew or was chargeable with knowledge of the debt.") (internal quotation marks and citations omitted); William T. Plumb, Jr., *Federal Liens and Priorities—Agenda for the Next Decade*, 77 YALE L.J. 228, 259 (1968) ("[T]he prevailing view

the defendant paid the other debts."[10]    Accordingly, a corporate officer is personally liable if, on behalf of the corporation, he (1) pays a non-federal debt (2) before paying a claim of the United States (3) at a time when the corporation was insolvent, (4) if he had knowledge or notice of the claim. *See United States v. Coppola*, 85 F.3d 1015, 1020 (2d Cir. 1996).

In the instant case, Renda does not dispute that the first and third elements are satisfied.  That is, it is undisputed that Renda, acting as Renda Marine's representative, caused Renda Marine to make the July 2003 and December 2005 transfers and that, at the time of those transfers, Renda Marine was insolvent. Renda's personal liability for the amount of the transferred assets therefore hinges on whether, at the time of the transfers, (1) the government had a "claim" against Renda Marine, and, if so, (2) Renda had "knowledge" or "notice" of that claim.

### A.    The Government Had a Claim Against Renda Marine

The first issue on appeal, which the parties agree is a matter of first impression, is whether a CO's determination that a government contractor is indebted to the government, rendered pursuant to the authority granted by the CDA, constitutes a "claim" within the meaning of the Priority Statute.  Our starting point is the statute's plain meaning, ascertained by reference to "the particular statutory language at issue, as well as the language and design of the statute as a whole." *See Frame v. City of Arlington*, 657 F.3d 215, 224 (5th Cir. 2011).

On its face, the statutory definition of "claim"—"any amount of funds or property that has been determined by an appropriate official of the Federal

---

is that the liability is not to be imposed unless the fiduciary has actual knowledge of the claim, or at least possesses such information 'as would put a reasonably prudent man upon inquiry.' ") (collecting cases).

[10] *Lutz*, 295 F.2d at 742; *see also Hatch v. Morosco Holding Co.*, 61 F.2d 944, 945–46 (2d Cir. 1932); *Bartlett*, 186 F. Supp. 2d at 885.

No. 11-41203

Government to be owed to the United States by a person, organization, or entity other than another Federal agency"—captures within its scope a CO's decision on a claim relating to a government contract. 31 U.S.C. § 3701(b)(1). The language of the Final Decision tracks the definition of claim: it includes a determination —"I hereby determine"—that a person, organization, or entity —"Renda Marine, Inc."—owes an amount of funds to the United States—"is indebted to the Government in the amount of $11,860,000.000." And, as the official statutorily designated to make decisions with respect to claims relating to government contracts, 41 U.S.C. § 7103, a CO surely qualifies as "an appropriate official of the Federal Government."[11]

The purpose and design of the Priority Statute likewise prompt the conclusion that the Final Decision is a "claim." The Priority Statute was enacted "to secure an adequate revenue to sustain the public burthens [sic] and discharge the public debts." *Moore*, 423 U.S. at 81 (quoting *United States v. State Bank of N.C.*, 31 U.S. (6 Pet.) 29, 35 (1832)). To ensure its purpose is fulfilled, the Supreme Court has instructed lower courts to give the Priority Statute "a liberal interpretation," *State Bank of N.C.*, 31 U.S. at 39, counseling that "All debtors to the United States, whatever their character, and by whatever mode bound, may be fairly included" within its reach, *Bramwell*, 269 U.S. at 487 (quoting *Beaston*, 37 U.S. at 134). Consistent with this teaching, "courts have applied the priority statute to Government claims of all types." *Moore*, 423 U.S. at 82 (holding that obligations to the government, even if unliquidated, are entitled to priority); *United States v. Moriarty*, 8 F.3d 329, 334 (6th Cir. 1993) (holding that the government had a "claim" within the meaning of the Priority Statute even though its cause of action for recovery was barred by the statute of

---

[11] Additionally, we note that a CO's decision fits within the statute's catch-all definition of "claim." *See* 31 U.S.C. § 3701(b)(1) (providing that "A claim includes, without limitation . . . other amounts of money or property owed to the Government").

limitations); *Viles v. C.I.R.*, 233 F.2d 376, 380 (6th Cir. 1956) (holding that appellant's tax liabilities were subject to priority even though they were contested and had not been formally assessed).

By recognizing that "claim" has been interpreted expansively, we do not mean to suggest that the term is boundless in scope. As the Supreme Court noted, "it is at least doubtful on the statute's wording that obligations wholly contingent for ultimate maturity and obligation upon the happening of events after insolvency" are within the statute's ambit. *Massachusetts v. United States,* 333 U.S. 611, 627–28 (1948). That is, government claims not currently in existence but which may arise in the future are not entitled to priority. *E.g.*, *United States v. Culburt (In re Metzger)*, 709 F.2d 32, 34 (9th Cir. 1983) (holding that criminal defendant's transfer of his boat prior to sentencing did not violate the Priority Statute because, at the time of the transfer, any government claim was contingent on whether the sentencing judge would exercise his discretion to impose a fine as part of the sentence).

Seizing on that limitation, Renda argues on appeal that the Final Decision was not a "claim" because it was not truly final at the time of the July 2003 transfer. He references two provisions of the CDA to support his position. First, he draws a negative inference from § 7103(g) of the CDA, which states: "The contracting officer's decision on a claim is final and conclusive and is not subject to review by any forum, tribunal, or Federal Government agency, *unless an appeal or action is timely commenced as authorized by this chapter*." 41 U.S.C. § 7103(g) (emphasis added). It follows from the italicized language, Renda reasons, that until the period to timely commence an appeal or action has passed, a claim is neither final nor conclusive. Second, he calls to our attention the *de novo* review provision in § 7104(b)(4), which the Federal Circuit has interpreted as providing that "once an action is brought following a contracting officer's decision, the parties start in court or before the board with a clean

slate." *Wilner v. United States*, 24 F.3d 1397, 1403 (Fed. Cir. 1994); *see also id.* at 1403 n.8 (noting that, prior to the CDA's enactment, filing an appeal "vacated" a CO's decision, and concluding that "there is no reason to believe that, in enacting the [CDA], Congress intended to change this established rule"). If the finality of a CO's decision depends on whether it is appealed and the filing of a suit before the Court of Federal Claims has the effect of vacating it, Renda contends, the underlying claim cannot be considered final before the statutory period for appeal has passed.

Were finality a requirement of the Priority Statute, Renda would have a stronger case. But the word "final" is conspicuously absent from the statutory definition of "claim." *See* 31 U.S.C. § 3701(b)(1) (defining "claim" as "any amount of funds or property that has been determined by an appropriate official of the Federal Government to be owed to the United States by a person, organization, or entity other than another Federal agency"); § 3701(b)(1) (clarifying that "claim" includes, without limitation, seven categories of debts, including the catch-all, "other amounts of money or property owed to the Government"). Congress knows how to distinguish "decisions" from "final decisions," *see* 28 U.S.C. § 1291 (cabining federal appellate jurisdiction to "final decisions" of district courts), and "determinations" from "final determinations," *see* 5 U.S.C. § 8503 (providing for judicial review of federal employee compensation eligibility, but only in the case of a "final determination").

The Supreme Court's decision in *Moore* illustrates that a claim arising out of a government contract need not be final to be accorded priority. That case, like this one, involved a contractor's breach of a government contract. 423 U.S. at 78. After the government notified the contractor of its intent to terminate the contract but before it filed suit, the contractor, an insolvent company, assigned all of its assets to a third party. *Id.* at 78–79. The government sued, alleging that the assignment of assets violated an earlier but materially

No. 11-41203

indistinguishable version of the Priority Statute.[12] *Id.* at 79. Notably, at the time the government sued, no government official or court had made an official determination of indebtedness. Yet the Court ruled that the government's unliquidated claim was nonetheless entitled to priority, reasoning that "nothing on the face of the statute, and no potential difficulty in administering it, require that a distinction be drawn for this purpose between liquidated and unliquidated debts." *Id.* at 83. The Court rejected the argument that the term "debts due," which has since been revised to read "claim,"[13] should "be read to mean only those obligations that would on the date of the assignment have given rise to a common-law action for debt." *Id.* at 83. In response to the argument that the government's claim was too indefinite to be entitled to priority, the Court responded that the claim "was fixed and independent of events after insolvency," even though it was not certain in amount or reduced to judgment, because "only the precise amount of that obligation awaited future events." *Id.* at 85 (internal quotation marks omitted). It follows that the government's claim against Renda Marine, which was certain in amount and determined by an appropriate government official, likewise is entitled to priority.

---

[12] *See United States v. Estate of Romani*, 523 U.S. 517, 524 (1998) ("The text of the priority statute . . . is virtually unchanged since its enactment in 1797."); *see also* Maloy, *supra* note 3, at 1205 ("The modern Priority Statute has been in effect since 1797 without material change.").

[13] A previous version of the representative liability provision, formerly codified at 31 U.S.C. § 192, imposed personal liability on "[e]very . . . person, who pays, in whole or in part, any debt due by the person . . . for whom or for which he acts before he satisfies and pays the debts due to the United States." In 1982, the term "claim" was substituted for the phrase "debts due" to maintain internal consistency within the section. *See* 31 U.S.C. § 3713, hist. n. ("In the section, the word 'claim' is substituted for 'debts' for consistency. The word 'due' is omitted as unnecessary."). Because "nothing in the statutory scheme indicates that this substitution was meant to change the law substantively," courts interpreting the term "claim" under the current version of the Priority Statute often look for guidance to past decisions in which courts interpreted the term "debts due." *See Moriarty*, 8 F.3d at 334.

Not only is Renda's proposed interpretation contrary to Supreme Court precedent, it would also undermine the purpose of the Priority Statute. The Priority Statute was designed to induce a debtor and its representatives to pay the debts of the government first or, at a minimum, to preserve a debtor's assets pending resolution of any dispute regarding the government's claim. *See Massachusetts,* 333 U.S. at 636. If, as Renda posits, a debt determination made by a CO is not entitled to priority during the time in which it can be contested, a debtor might attempt to circumvent the Priority Statute by appealing the determination to the ASBCA or the Court of Federal Claims and, in the interim, transferring all of its assets to inside creditors.

The Priority Statute "is not to be defeated by unnecessarily restricting the application of the word '[claim]'[14] within a narrow or technical meaning," *Moore*, 423 U.S. at 81 (quoting *Price v. United States*, 269 U.S. 492, 500 (1926)), and to give "claim" a meaning more restrictive than Congress gave it in the statute and courts have given it in its 200-year history would do just that. We conclude that the term "claim" encompasses a CO's determination that a government contractor is indebted to the government.

## B.    Renda Had Notice of the Claim

The second issue on appeal is whether a corporate officer has notice of a federal claim if he knows of its existence but, in reliance on the advice of the corporation's attorney, believes it to be invalid. According to Renda, Erikson advised him that "any claim the Government made should be addressed in the pending claim before the Court of Federal Claims," and, therefore, the Final Decision was "void" and "did not require any action by Renda Marine." Because he was under a mistaken impression that the claim was invalid, Renda argues, he cannot be charged with notice of it.

---

[14] *See*, *supra*, n.13.

No. 11-41203

We follow the majority of other courts in holding that a representative's actual knowledge of a federal claim is sufficient, notwithstanding that representative's reliance on the erroneous advice of counsel as to how to address the claim.[15] *See King v. United States*, 379 U.S. 329, 339–40 (1964) (holding corporate officer personally liable for distribution where he was aware of the existence of a government claim, but relied on the erroneous advice of corporate counsel that the corporation had sufficient assets to pay it); *Coppola*, 85 F.3d at 1020–21 (holding executor personally liable for unpaid estate taxes, even though a formal deficiency notice had not yet issued at the time of the transfer, because his informal discussions with the IRS put him on notice of the tax liability); *Bartlett*, 186 F. Supp. 2d at 886–87 (holding executrix personally liable for distribution, even though she relied on her tax attorney to handle the tax liabilities of the estate, because she had actual knowledge of the tax liability); *Golden Acres*, 684 F. Supp. at 97, 101–03 (holding corporate officers personally liable for distributions, even though they had been advised by their attorneys that they had a right to repayment, because they were on notice of the outstanding mortgage held by the government).

A recent case in our circuit is illustrative. *See United States v. MacIntyre*, No. H-10-2812, 2012 WL 2403491 (S.D. Tex. Jun. 25, 2012). There, as here, appellants argued that they were not personally liable under the Priority Statute because they did not believe the government's claim was valid, after receiving legal advice to that effect. *Id.* at *4. The court disagreed, emphasizing that

---

[15] Renda relies on a decision of the United States Tax Court for the proposition that reliance on the advice of an attorney relieves a debtor's representative from liability under the Priority Statute. *See Little v. C.I.R.*, 113 T.C. 474 (1999). Notably, the Tax Court reiterated that "[t]he knowledge requirement of [the representative liability provision] may be satisfied by either actual knowledge of the liability or notice of such facts as would put a reasonably prudent person on inquiry as to the existence of the unpaid claim of the United States." *Id.* at 480. To the extent that the analysis in *Little* that followed is inconsistent with the weight of authority on this issue, we decline to follow it.

15

No. 11-41203

> belief in the validity of the government's claim is not the test. [Appellants] had sufficient notice of the claim to put a reasonably prudent person on notice. It is regrettable that they received incorrect advice on that point, but poor legal advice is not a defense. Despite their belief that the government's claim was not valid, [appellants] were required by § 3713 to preserve the funds to pay the government's claim—should it be proved valid. Accordingly, [appellants] both meet the test for individual liability under § 3713 and are therefore personally liable for distributions made from [the decedent's] Estate and Trust.

*Id.* As that and other courts have held, and we now reiterate, the reach of the Priority Statute "is not cabined by the poor advice of attorneys."[16] *Golden Acres*, 684 F. Supp. at 103.

Undergirding our conclusion are two considerations, one springing from the statute's text and the other from its purpose. First, the statute does not provide for an attorney-reliance exception. Over the years, courts have read into the Priority Statute the "knowledge" and "insolvency" requirements to protect innocent representatives. We decline to announce a further exception. Second, a contrary interpretation would create an exception to the Priority Statute that might swallow the rule. As long as a debtor's representative were to receive advice from counsel that the debtor had some basis to contest the government's claim, the representative could distribute the debtor's assets to non-federal creditors. Such an interpretation would defeat the purpose of § 3713(b) to ensure that debts of the United States are repaid first. *See Moore*, 423 U.S. at 81 (explaining that the personal liability provision is what "g[ives] the priority teeth"); *King*, 379 U.S. at 337 (noting that the purpose of the personal liability provision "is to make those into whose hands control and possession of the

---

[16] We highlight that our decision does not leave representatives who receive poor advice from counsel without recourse. They may, as Renda Marine did here, sue counsel for malpractice.

debtor's assets are placed, responsible for seeing that the Government's priority is paid").

## COLLATERAL ISSUES

In addition to the two principal issues, discussed above, bearing directly upon his liability under the Priority Statute, Renda raises on appeal several collateral issues, including whether (1) the district court abused its discretion in striking his counterclaim and affirmative defenses, (2) the district court erred by using preclusively against him the Final Decision and the results of prior litigation involving Renda Marine, and (3) the government is judicially estopped from arguing on appeal that its right to payment was "fixed" at the time of the July 2003 and December 2005 transfers. The government argues, and we agree, that such issues are not pertinent to Renda's liability under the Priority Statute. Because they are interrelated and do not merit extended consideration, we address them together in summary fashion.

First, the district court did not abuse its discretion in striking Renda's counterclaim and affirmative defenses attacking the merits of the Final Decision because the validity of the government's claim against Renda Marine had been resolved with finality before the government brought a representative liability claim against Renda. *Renda Marine, Inc. v. United States*, 509 F.3d 1372 (Fed. Cir. 2007). Renda's main point of contention is that he, personally, was never given the opportunity to challenge the merits of the Final Decision. But Renda's personal liability under § 3713(b) is not derivative of the Final Decision itself; it rather stems from his own actions in transferring assets in knowing disregard of the government's claim. *See Moriarty*, 8 F.3d at 333 ("[T]he United States' cause of action against [appellant representatives] is a wholly independent cause of action from the United States' cause of action against the debtor for the amount owed due to the breach of contract."). We do not read the Priority

17

Statute to absolve a representative from personal liability if he does not participate in the resolution of the validity of the underlying claim.

Second, the factual findings of the Final Decision were not used preclusively against Renda in violation of § 7104(e) of the CDA, which states that if a CO's decision includes findings of fact, such findings "are not binding in any subsequent proceeding," 41 U.S.C. § 7103(e), because the government did not rely on the Final Decision for its factual findings. To the contrary, the Final Decision was adduced for the purpose of establishing an essential element of the government's case: that the government had a claim, within the meaning of the Priority Statute, against Renda Marine at the time of the transfers. The cases Renda marshals in support of his CDA-preclusion theory are inapposite: they stand for the settled proposition that, in an action brought by a government contractor in the Court of Federal Claims pursuant to § 7104(b), the factual findings of a CO are not accorded presumptive weight and a contractor is free to challenge both them and the legal conclusions they compel. *See Roxco, Ltd. v. United States*, 60 Fed. Cl. 39, 45–46 (2004); *Russell Corp. v. United States*, 15 Cl. Ct. 760, 763 (1988).

Nor was the Final Decision used preclusively against Renda in violation of the Due Process Clause, U.S. CONST. amend. V, or the federal common law doctrine of collateral estoppel, which "bars relitigation of an issue actually and necessarily decided in a prior action," *Wolfson v. Baker*, 623 F.2d 1074, 1077 (5th Cir. 1980). Renda points to no case holding that the government's use of evidence of its underlying claim against a debtor to prove elements of its § 3713(b) cause of action against the debtor's representative is improper or raises constitutional concerns.[17] Indeed, a contrary rule requiring the government to

---

[17] In the case on which Renda relies, *United States v. Gottheiner*, 703 F.2d 1136 (9th Cir. 1983), the government introduced a judgment rendered against an insolvent company to prove its § 3713(b) claim against the corporate officer of that company. In this case, the

No. 11-41203

prove the merits of its underlying claim against the debtor using independent evidence of the debt (e.g., evidence that Renda Marine did not live up to its obligations under the Dredging Contract) would not only be unnecessary and impractical, but also is not required by the plain language of the Priority Statute or the case law interpreting it.

Third, the government is not judicially estopped from arguing that its right to payment was "fixed" at the time of the July 2003 and December 2005 transfers and not contingent upon future litigation. The federal common law doctrine of judicial estoppel "prevents a party from asserting a position in a legal proceeding that is contrary to a position [it has] previously taken in the same or some earlier proceeding." *Hall v. GE Plastic Pac. PTE Ltd.*, 327 F.3d 391, 398 (5th Cir. 2003). In its prior action against Renda Marine in the Eastern District of Texas, the government took the position that it was not required to bring suit to enforce the Final Decision, under the applicable statute of limitations, until December 2007, when Renda Marine's legal challenge to the Final Decision in the Court of Federal Claims and Federal Circuit had run its course.[18] According to Renda, that position is inconsistent with a position the government has taken in this litigation: namely, that the Final Decision was "final and conclusive" upon the passing of the statutory deadline to appeal in November 2003. He

government did not introduce the underlying judgments against Renda Marine, but instead offered direct evidence of its underlying claim against Renda Marine: the Final Decision. Although the government used different methods of proof, in both cases the underlying claim against the company had been resolved with finality and was not subject to collateral attack.

[18] *See United States v. Renda Marine, Inc.*, 750 F. Supp. 2d 755, 764–66 (E.D. Tex. 2010). The statute of limitations for government contract actions requires the government to bring suit either "within six years after the right of action accrues or within one year after final decisions have been rendered in applicable administrative proceedings required by contract or by law." 28 U.S.C. § 2415(a). The government argued, and the district court held, that the one-year savings clause tolled the statute of limitations during the pendency of Renda Marine's challenges in the Court of Federal Claims and Federal Circuit, and, accordingly, the action initiated by the government to enforce the Final Decision was not time barred. *Renda Marine*, 750 F. Supp. 2d at 764–66.

contends that the government is therefore judicially estopped from claiming that its right to payment was "fixed" at the time of the transfers and not contingent upon future litigation.  We disagree.  It is not inconsistent for the government to assert that (1) a contractor's challenge to the decision of a CO is untimely and barred by the CDA, and (2) because the contractor was permitted to bring its untimely challenge, the government was not required to bring suit to enforce the decision until the untimely challenge had run its course.

## CONCLUSION

For the foregoing reasons, we hold as a matter of law that (1) the decision of a CO is a "claim" within the meaning of the Priority Statute, and (2) a debtor's representative has "notice" of that claim, necessary to trigger personal liability under the Priority Statute, when he has actual knowledge of its existence, whether or not he consults counsel as to its validity.  We conclude that no genuine issues of material fact remain, and the government is entitled to judgment as a matter of law.  Further, the district court did not abuse its discretion in striking the affirmative defenses and denying the motion for reconsideration.  AFFIRMED.